UNITED STATES DISTRICT COURT for
the WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*ex rel.* [UNDER SEAL],<br><br>    Plaintiffs,<br><br>  v.<br><br>[UNDER SEAL],<br><br>    Defendants. | Civ. Action No. _____<br><br>***QUI TAM* COMPLAINT<br>FILED UNDER SEAL<br>PURSUANT TO<br>31 U.S.C. § 3730(b)2<br>DEMAND FOR JURY TRIAL** |

# UNITED STATES DISTRICT COURT for
# the WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rels.* Melanie Fouchi,<br><br>　　　　　　Plaintiffs,<br><br>　v.<br><br>LHC GROUP, INC. AND UNITEDHEALTH GROUP INCORPORATED,<br><br>　　　　　　Defendants. | **Civ. Action No. _____**<br><br>***QUI TAM* COMPLAINT**<br>**FILED UNDER SEAL**<br>**PURSUANT TO**<br>**31 U.S.C. § 3730(b)2**<br>**DEMAND FOR JURY TRIAL** |

1

## COMPLAINT

On behalf of the United States of America, the Relator Melanie Fouchi files this *qui tam* Complaint against Defendants LHC Group, Inc. and UnitedHealth Group Incorporated,

## INTRODUCTION

1. This is an action brought by Relator Melanie Fouchi to recover treble damages and civil penalties on behalf of the United States of America ("Government") arising from unlawful schemes by Defendants LHC Group, Inc. and UnitedHealth Group Incorporated, (collectively: "Defendants") to obtain improper reimbursements from Medicare and other Government-funded health insurance plans.

2. Defendants generated false diagnosis codes and health status descriptions for patients evaluated and admitted for home health services leading to inflated payments from Medicare and other Government-funded health plans.

3. Defendants' conduct alleged herein is in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729 et seq., as amended ("FCA").

## PARTIES

4. Defendant LHC Group, Inc. ("LHC") is a Delaware corporation with headquarters in Lafayette, Louisiana.

5. LHC is a national provider of in-home healthcare services. According to LHC's website, it employs approximately 29,000 employees delivering "home health, hospice, home- and community-based services, and facility care in 38 states and the District of Columbia – reaching 68 percent of the U.S. population aged 65 and older."

6. Upon information and belief, LHC and/or its affiliates are Medicare-certified "home health agencies."

7. Defendant and UnitedHealth Group Incorporated ("UHG") is a publicly traded Delaware corporation with headquarters in Minnetonka, Minnesota.

8. Through its subsidiaries, UHG offers both healthcare insurance services as well as healthcare services directly to patients.

9. UHG's healthcare insurance products include Medicare Advantage plans offered under Medicare Part C.

10. In 2022, UHG reported revenue of approximately $324 billion and net income of approximately $20 billion.

11. In or around February 2023, UHG completed its acquisition of LHC for $5.4 billion.

12. Relator Melanie Fouchi has a Bachelor of Science in Nursing and has been a Registered Nurse for approximately 23 years. She worked as a home health nurse for the LHC location in Asheville, North Carolina from August 2022 until November 2022. Relator's primary responsibility during her employment with LHC was to meet patients in their homes and evaluate them for admission to LHC's home-health program.

## JURISDICTION AND VENUE

13. Venue and jurisdiction are the same under the FCA. 31 U.S.C. § 3732. An action may be brought in any judicial district in which any defendant may be found or in which any proscribed act occurred. 31 U.S.C. § 3732(a).

14. The United States District Court for the Western District of Louisiana has jurisdiction and venue for any Complaint brought in the matter because LHC Group, Inc. is located in this district and proscribed acts occurred in this district.

15. Relator is unaware that the allegations of wrongdoing in this Disclosure have been publicly disclosed, nor are the allegations herein based on any public disclosures which may exist.

16. Furthermore, Relator is an "original source" under the FCA as this voluntary disclosure precedes any public disclosures that may occur and the Relator's knowledge of the alleged wrongdoing is independent of, and materially adds to, any public disclosure that may have occurred.

17. Pursuant to 31 U.S.C. § 3730(b)(2), the Relator must provide the Government with a copy of the Complaint and/or a written disclosure of substantially all material evidence and material information in their possession contemporaneous with the filing of the Complaint.  Relator complied with this provision by serving a pre-suit Disclosure Statement with attached exhibits upon the United States Attorney for the Western District of Louisiana Arizona on or about November 16, 2023.

18. In further compliance with 31 U.S.C. §3730(b)(2), Relator shall, contemporaneously with the filing of this Complaint, serve copies of this Complaint upon the United States Attorney for the Western District of Louisiana and on the Honorable Merrick Garland, Attorney General of the United States.

19. In further compliance with 31 U.S.C. § 3730(b)(2), this Complaint is being filed *in camera* and will remain under seal for a period of at least sixty days and shall not be served on the Defendants until the Court so orders.

## LEGAL FRAMEWORK

A.  The Federal False Claims Act

20. Originally enacted in 1863, Congress substantially amended the FCA in 1986. The 1986 amendments enhanced the Government's ability to recover losses sustained as a result of fraud, against the United States.

21. Further clarifying amendments were adopted in May 2009 and March 2010. The FCA imposes liability upon any person who "knowingly presents, or causes to be presented [to the Government] a false or fraudulent claim for payment or approval;" or "knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim;" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. 3729(a)(1)(A), (B), (G).

22. Any person found to violate these provisions is liable for a civil penalty of up to $11,000 for each such false or fraudulent claim, plus three times the amount of the damages sustained by the Government.

23. Significantly, the FCA imposes liability where the conduct is merely "in reckless disregard of the truth or falsity of the information" and further clarifies that "no proof of specific intent to defraud is required." 31 U.S.C. 3729(b)(1).

24. The FCA also broadly defines a "claim" as one that includes "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that — (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government — (i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A).

5

25. The FCA empowers private persons having information regarding a false or fraudulent claim against the Government to bring an action on behalf of the Government and to share in any recovery.

26. The complaint must be filed under seal without service on any Defendant.

27. The complaint remains under seal while the Government conducts an investigation of the allegations in the complaint and determines whether to intervene in the action. 31 U.S.C. § 3730(b).

B.  Federally Funded Health Insurance Programs

### 1. Medicare

28. Medicare is a federally-funded health insurance program for the elderly and persons with certain disabilities, providing hospital insurance. Medicare covers doctor's visits, medication, durable medical equipment, and more for beneficiaries living with HIV. All Medicare prescription drug plans are legally required to cover HIV medications such as antiretrovirals. Costs for HIV treatment under Medicare include premiums, deductibles, copayments, and coinsurance for necessary services and medications.

29. Medicare payments come from the Medicare Trust Fund, which is funded primarily by payroll deductions taken from the United States work force through mandatory Social Security deductions.

30. Medicare is generally administered by the Centers for Medicare and Medicaid Services ("CMS"), which is an agency of the Department of Health and Human Services ("HHS"). CMS establishes rules for the day-to-day administration of Medicare. CMS contracts with private companies to handle the day-to-day administration of Medicare.

31. CMS, through contractors, maintains and distributes fee schedules for the payment of physician and healthcare provider services. These schedules specify the amounts payable for defined types of medical services and procedures.

### 2. Medicaid

32. Medicaid is a state and federal assistance program to provide payment of medical expenses for low-income patients. Medicaid was created in 1965 in Title XIX of the Social Security Act. Funding for Medicaid is shared between the Federal Government and state programs that choose to participate in Medicaid.

33. At all relevant times to this matter, applicable Medicaid regulations relating to coverage for HIV medications have been substantially similar in all material respects to the applicable Medicare provisions detailed below.

### 3. Tricare

34. TRICARE is a federal program which provides civilian health benefits for military personnel, military retirees, and their families. TRICARE is administered by the Department of Defense and funded by the Federal Government. *See* 32 C.F.R. 199.17. At all relevant times to the matter, applicable TRICARE regulations relating to coverage of claims by providers and physicians have been substantially similar in all material respects to the applicable Medicare provisions described herein.

### 4. Federal Employees Health Benefit Plan ("FEHBP")

35. FEHBP provides health insurance coverage for nearly 8.7 million federal employees, retirees and their dependents. It is a collection of individual healthcare plans, including the Blue Cross and Blue Shield Association and the Government Employees Health Association. At all relevant times to the matter, applicable FEHBP regulations relating to coverage of claims by

providers and physicians have been substantially similar in all material respects to the applicable Medicare provisions described herein.

36. Medicare, Medicaid, TRICARE, FEHBP and other similar federally-funded programs are referred to collectively herein as "Government-funded health plans."

### C. Medicare Coverage of Home Health Care Services

37. Home Health Care ("HHC") are services such as skilled nursing care, physical and occupational therapy, speech language therapy, and medical social services provided by skilled health care professionals at the patient's home.

38. Medicare covers HHC services that are "reasonable and necessary" only when the patient is:

- "confined to the home"
- "under the care of a physician…"
- "receiving services under a plan of care…" and
- "in need of skilled nursing care on an intermittent basis or physical therapy or speech-language pathology; or have a continuing need for occupational therapy."

See Medicare Policy Benefit Manual, Chapter 7, §30.  See also §§1814(a)(2)(C) and 1835(a)(2)(A) of the Act.

39. Unlike the more common retrospective, fee-for-service system by which Medicare Parts A & B pays for most covered medical services, Medicare pays for HHC services on a prospective basis.

40. Specifically, Medicare Parts A & B pay the home health agency a per-beneficiary fee for all covered home health services to be rendered over a 30-day period. Medicare Policy Benefit Manual, Chapter 7, §10.1.

8

41. The fee paid per-beneficiary is pre-determined based on several factors including the patient's "functional impairment level." Id. at §10.2.

42. A patient's functional impairment level is determined by the provider's responses on the Outcome and Assessment Information Set ("OASIS") and is intended to determine the patient's level of impairment and resulting level of medical resources the provider is likely to devote to that patient over the 30-day service period. In general: the higher the patient's functional impairment level, the higher the fee Medicare will pay the provider for caring for that patient.

43. Coverage of HHC services under part C works similarly as under parts A & B. Under part C, the Medicare Program pays each MA Plan a predetermined monthly amount for each Medicare beneficiary in the plan. This monthly payment is known as a "per-member, per-month" payment.

44. The payment for each plan varies depending on certain factors, including amounts set forth in the plan's bid submitted to CMS and on risk factors such as gender, age, and health status.

45. By risk adjusting for health status, Congress required that more be paid for beneficiaries with higher risk scores than be paid for beneficiaries with lower risk scores.

46. Medicare Part C employs a health-based risk adjustment model that takes into account diagnoses from inpatient hospital stays, outpatient encounters, and physician office visits.

47. The risk-adjustment model is prospective, meaning that it relies on diagnoses for certain medical conditions assigned to beneficiaries by their physicians in one period of service to set the payment for each beneficiary for the following service period.

48. As with parts A & B, the worse a patient's medical condition in one period of service—as documented by the provider—the higher the Medicare payment for the following period of service.

## **COURSE OF CONDUCT**

49. Defendant LHC generated false diagnosis codes and health status descriptions for patients evaluated and admitted for home health services to increase payments from Medicare and other Government-funded health plans by making it appear that the patient's health status was worse than it actually was.

50. As noted above, the Relator's primary responsibility during her employment with LHC was to meet patients in their homes and conduct an initial evaluation on which a plan of care could be developed.

51. Relator recorded the results of her evaluations electronically on the OASIS form which CMS uses to determine the patient's level of impairment and the fee to be paid to the home health agency for services rendered to that patient during the subsequent 30-day service period.

52. However, before the OASIS form was forwarded to CMS, LHC would review the Relator's responses and demand changes.

53. These changes were, predominantly, changes that decreased the patient's level of functional impairment and thus, the fee paid by CMS for HHC services rendered to that patient.

54. Because these patient chart reviews were so overwhelmingly one-sided—i.e., resulting in increased rather than decreased functional impairment—the Relator believes LHC conducted them for the purpose of increasing payments from Government-funded health plans regardless of the patient's actual health status.

55. In support of her allegations, Relator notes specific examples of changes that LHC reviewers required on the OASIS forms she completed for the patients she evaluated.  These changes are all made by reviewers who, unlike the Relator, had no direct contact with the patient and, as noted above, are overwhelmingly changes that make the patient appear to have a higher

functional impairment than they actually do. The following are specific examples of patients the Relator evaluated for LHC and for whom LHC demanded that the Relator change her responses on the OASIS form to make them appear to be more functionally impaired than they actually were.

56. On August 12, 2022, the Relator evaluated Patient 1[1].

- In response to OASIS question M1850, the Relator noted that the patient was "able to transfer with minimal human assistance" and selected Code 1, indicating that the patient was "able to transfer with minimal human assistance or with use of an assistive device." The LHC reviewer changed this response to: "unable to transfer self" and selected Code 2, indicating that patient is "able to bear weight and pivot during the transfer process but unable to transfer self." This proposed change was not based on any direct evaluation of the patient nor on any discussion with the Relator of her first-hand observations. More critically, the change misrepresented the patient's condition and was in clear violation of the OASIS Guidance Manual.

- In response to OASIS question M1860, the Relator noted that the patient required "use of a two-handed device" for ambulating and the LHC reviewer changed this response to "able to walk only with the supervision or assistance of another person at all times."

- In response to OASIS question M2020, the Relator noted that the patient was "able to independently take the correct oral medications" and the LHC reviewer changed

---

[1] Patient names and other identifying information are redacted herein in compliance with the Health Insurance Portability and Accountability Act ("HIPAA") and other relevant authorities.

this response to: "unable to take medications unless administered by another person."

57. On August 16, 2022, the Relator evaluated Patient 2.

- In response to OASIS question M1810, the Relator noted that the patient was "able to dress upper body without assistance" and the LHC reviewer changed this response to: "someone must help the patient put on upper body clothing."

- In response to OASIS question M1840, the Relator noted that the patient was "unable to get to and from the toilet but is able to use a bedside commode" and the LHC reviewer changed this response to "is totally dependent in toileting."

58. On August 17, 2022, the Relator evaluated Patient 3.

- In response to OASIS question M1840, the Relator noted that the patient was "unable to able to take medications at the correct times" and the LHC reviewer changed this response to: "unable to take medication unless administered by another person."

59. On August 15, 2022, the Relator evaluated Patient 4.

- In response to OASIS question M2020, the Relator noted that the patient was "able to take medications at the correct times" and the LHC reviewer changed this response to: "unable to take medication unless administered by another person."

60. As explained above, the higher functional impairment levels falsely reflected in LHC's changes to the Relator's patient evaluations led to improper higher payments for patients under Medicare Parts A & B.

61. For patients covered by a MA Plan under part C, the higher functional impairment levels led to higher payments to the MA Plans.

62. Upon information and belief, these higher payments to the MA Plans benefited LHC directly as their contractual arrangement with the MA Plans provides for a percentage share of the payments that the MA Plans receive from CMS for the beneficiaries under LHC's care.

### DEFENDANT'S IMPROPER CONDUCT RISKED HARM TO PATIENTS

63. Defendants' unlawful practices exposed patients to unnecessary risk of harm.

64. As described above, Defendants' scheme resulted in patient evaluations that misrepresented those patients as being in worse condition than they actually were.

65. These misrepresentations can lead to psychological distress to patients and potentially unnecessary procedures which can, in turn, exacerbated the already unnecessary distress. Defendants knowingly and willingly exposed their patients to this harm because they were more interested in increasing reimbursements received from Government-funded health care plans.

### DEFENDANT'S IMPROPER CONDUCT CAUSED SUBSTANTIAL DAMAGE TO THE GOVERNMENT

66. Defendants violated the FCA by knowingly making false statements to obtain reimbursement from Government-funded health plans.

67. Through the schemes detailed above, Defendant's ignored its patients' true needs and damaged the Government significantly by causing millions of dollars in false or fraudulent claims for reimbursement.

### CONCLUSION

68. Defendants caused the Government to incur substantial damages by presenting, making, using or causing to be presented, made or used thousands of False Claims to Government-funded health programs.

69. The False Claims resulted in remuneration unlawfully received by the Defendants. More specifically, Defendants violated numerous provisions of the FCA, including, but not limited to, the following: 31 U.S.C. § 3729(a)(1)(A); 31 U.S.C. § 3729(a)(1)(B); 31 U.S.C. § 3729(a)(1)(C); 31 U.S.C. § 3729(a)(1)(D); 31 U.S.C. § 3729(a)(1)(G).

70. Failure to hold Defendants accountable for their unlawful conduct sets a dangerous precedent that Medicare and other Government-funded health plans are not serious about enforcing the rules promulgated concerning the conditions providers must meet to receive reimbursements.

71. In light of the foregoing, Defendants are liable to the United States for civil penalties and statutory damages.

### CLAIMS FOR RELIEF

#### COUNT I
**False Claims Act: Presentation of False Claims**
**31 U.S.C. § 3729(a)(1)(A)**

72. Relator repeats and incorporates by reference the allegations above as if fully contained herein.

73. As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, Defendants have "knowingly present[ed], or cause[d] to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval" in violation of 31 U.S.C. § 3729(a)(1).

74. As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $5,000 and as much as $11,000 for each such false or fraudulent claim submitted on or before November 2, 2015, and up to $21,563 for violations committed after November 2, 2015, plus three

times the amount of the damages sustained by the Government for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein. See 28 C.F.R. §§ 85.3(a)(9).

## COUNT II
### False Claims Act: Making or Using a False Record or Statement to Cause Claim to be Paid
### 31 U.S.C. § 3729(a)(1)(B)

75. Relator repeats and incorporates the allegations above as if fully contained herein.

76. As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, the Defendants have "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement – *i.e.*, the false certifications and representations made or caused to be made by the Defendants – to get a false or fraudulent claim paid or approved by the Government" in violation of 31 U.S.C. § 3729(a)(2).

77. As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $5,000 and as much as $11,000 for each such false or fraudulent claim submitted on or before November 2, 2015, and up to $21,563 for violations committed after November 2, 2015, plus three times the amount of the damages sustained by the Government for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein. See 28 C.F.R. §§ 85.3(a)(9).

## COUNT III
### False Claims Act: Conspiracy to Commit a Violation
### 31 U.S.C. § 3729(a)(1)(C)

78. Relator repeats and incorporates the allegations above as if fully contained herein.

15

79. As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, the Defendants and its agents have "conspire[d] to commit a violation of subparagraph (A), (B), (D)…or (G)" in violation of 31 U.S.C. §3729(a)(1)(C).

80. As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $5,000 and as much as $11,000 for each such false or fraudulent claim submitted on or before November 2, 2015, and up to $21,563 for violations committed after November 2, 2015, plus three times the amount of the damages sustained by the Government for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein. See 28 C.F.R. §§ 85.3(a)(9).

## COUNT IV
### False Claims Act: Knowingly Delivers Less Than All of Government's Property in Defendants' Possession
### 31 U.S.C. §3729(a)(1)(D)

81. Relator repeats and incorporate the allegations above as if fully contained herein.

82. As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, the Defendants "ha[d] possession, custody, or control of property or money used, or to be used, by the Government and knowingly deliver[ed], or cause[d] to be delivered, less than all of that money or property" in violation of 31 U.S.C. §3729(a)(1)(D).

83. As a result of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $5,000 and as much as $11,000 for each such false or fraudulent claim submitted on or before November 2, 2015, and up to $21,563 for violations committed after November 2, 2015, plus three times the amount of the damages sustained by the Government for each and every violation of 31

U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein. See 28 C.F.R. §§ 85.3(a)(9).

## COUNT V
### False Claims Act: Knowingly Conceals or Improperly Avoids an Obligation to Pay Money to the Government
### 31 U.S.C. §3729(a)(1)(G)

84. Relator repeats and incorporates the allegations above as if fully contained herein.

85. As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, the Defendants "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases and obligation to pay or transit money or property to the Government: in violation of 31 U.S.C. §3729(a)(1)(G).

86. As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $5,000 and as much as $11,000 for each such false or fraudulent claim submitted on or before November 2, 2015, and up to $21,563 for violations committed after November 2, 2015, plus three times the amount of the damages sustained by the Government for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein. See 28 C.F.R. §§ 85.3(a)(9).

### PRAYERS FOR RELIEF

WHEREFORE, for each of these claims, the *qui tam* Plaintiff/Relator requests the following relief from each of the Defendants, jointly and severally:

    a. Three times the amount of damages that the Government sustains because of the acts of Defendants;

    b. A civil penalty of for each violation;

  c. An award to the *qui tam* Plaintiff/Relator for collecting the civil penalties and damages;

  d. Award of an amount for reasonable expenses necessarily incurred;

  e. Award of the *qui tam* plaintiffs reasonable attorneys' fees and costs;

  f. Interest; and

  g. Such further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Relator hereby demand a trial by jury as to all issues.

December 20, 2023               Respectfully Submitted:

                    /s/ *Mark R. Mueller*

                    Mark R. Mueller
                    MUELLER LAW, LLC
                    363 Bloomfield Ave, 2-C
                    Montclair, NJ 07042
                    (973) 233-8290
                    mark@muellerlaw.com
                    william.hurlock@muellerlaw.com
                    ATTORNEYS FOR RELATOR